# In the United States District Court
# for the Southern District of Georgia
# Waycross Division

LARUE SHEFFIELD,

    Plaintiff,

v.

STATE FARM FIRE AND CASUALTY
COMPANY and STATE FARM MUTUAL
AUTOMOBILE INSURANCE COMPANY,

    Defendants.

CV 514-38

## ORDER

On January 18, 2013, Plaintiff Larue Sheffield ("Plaintiff") arrived at his home in Broxton, Georgia, to find his house on fire and his wife missing. Shortly thereafter, Plaintiff learned that his wife had been murdered in their home prior to the fire. Plaintiff then submitted a claim with State Farm Fire and Casualty Company ("SFF") and State Farm Mutual Automobile Insurance ("SFM") (collectively, "Defendants") to collect the proceeds due to him pursuant to the terms of his insurance contract. Defendants, however, refused to pay Plaintiff's claim, alleging that they have reason to believe that Plaintiff killed his wife and intentionally ignited the

fire, given the circumstances surrounding her death and the subsequent blaze. See generally Dkt. No. 89-1.

Notwithstanding Defendants' suspicions regarding matters in Plaintiff's personal life, Defendants contend that this Court should grant their partial motion for Summary Judgment because Plaintiff failed to: (1) properly plead his claims of fraud; (2) sufficiently support his claim of conspiracy; and (3) adequately demonstrate that Defendants acted in bad faith. Id. In response, Plaintiff alleges that Defendants are impermissibly prying into his personal life and that Defendants epitomize bad faith by refusing to honor the terms of their insurance agreement. See generally Dkt. No. 95.[1] Now pending before the Court is Defendants' Partial Motion for Summary Judgment (Dkt. No. 89-1) which the Court **GRANTS** in its entirety.

## FACTUAL BACKGROUND

I. Plaintiff's Home and Marriage

Plaintiff and his wife, Edith Sheffield ("Mrs. Sheffield"), were married in 1984. Dkt. No. 96 ¶ 64. Plaintiff owns a large plot of land, of at least sixteen acres, where many of his family members live. Dkt. No. 89-12, 13:7-25. Plaintiff's

---

[1] Plaintiff's response does not address Defendants' argument that Plaintiff failed to properly plead his fraud claim and that his conspiracy claim lacks merit. See generally Dkt. No. 95. In accordance with Fed. R. Civ. P. 56(e)(2), the Court may treat these claims as undisputed. Moreover, at the February, 8, 2016 Pre-Trial Conference, Plaintiff confirmed that he conceded the non-viability of these claims. Accordingly, Summary Judgment is appropriate and will be **GRANTED** as to **Counts II, III, VII, and VIII** (Fraud) and **Counts IV and IX** (Conspiracy).

2

mother, Faye Sheffield, lives next door to Plaintiff, id. at 56:10-12, and his sister, Dawn Wright, lives across the street with her family, id. at 52:23.[2] Adjacent to Plaintiff's home at 10817 Bowens Mill Road is a plot of land that Plaintiff purchased from his uncle, which now holds a mobile home. Id. at 13:5-18.

Originally, Plaintiff and his wife resided in a "single-wide mobile home" before Plaintiff built their house at 10817 Bowens Mill Road. Id. at 56:3-25. The house sat on a pond and featured a back porch that was approximately ten feet by thirty feet, in addition to a pool off to the left of the porch. Id. at 92:21-92:6. Shortly after building his home, Plaintiff purchased two different insurance policies from Defendants—a homeowners insurance policy and a motorcycle insurance policy. Dkt. No. 89-2 ¶¶ 3-4.[3] Plaintiff insured his home for $182,600, dkt. no. 89-3, p.1, a reduction from a prior, higher amount of $243,600, dkt. no. 95-2, p. 1. Plaintiff insured his 2005 Yamaha Road Start Motorcycle (VIN: JYAVP14E75A010227) through SFM for $25,000. Dkt. No. 89-2 ¶ 4; Dkt. No. 89-4, p. 1.

Plaintiff purchased the mobile home that sat adjacent to his house for his son and his wife to live in when they were

---

[2] Faye Sheffield accompanied Dawn Wright and her family on a trip to Hawaii when the events giving rise to this suit occurred. Id. at 110:22-111:18.
[3] Specifically, SFF issued an insurance policy covering Plaintiff's home in Broxton, Georgia, Policy No. 81-J0-6044-9, id. ¶ 3, and SFM issued an insurance policy covering Plaintiff's 2005 Yamaha Road Star Motorcycle, Policy No. 2829-308-11B. Id. ¶ 4.

3

married. Dkt. No. 89-12, 12:5-17. Plaintiff's son and his family lived in the mobile home for "approximately three years" until the family moved out in 2010. Id. at 12:19-25. After Plaintiff's son moved to Orlando, Florida, Plaintiff's friend, Courtney Hersey ("Hersey"), and her husband planned to live in the mobile home, rent-free, for approximately one month beginning in the latter half of January, 2013. Id. at 12:19-25, 125:11-126:11. Hersey did not have a formal lease with Plaintiff or his wife, and Hersey denied conclusively establishing that she intended to live at the Sheffields' mobile home during the relevant time period. Dkt. No. 89-18, 19:8-20:12.

II. **The Events of January 18, 2013**

   a. **Plaintiff's Arrival at the House**

Plaintiff describes his time leading up to the death of his wife as follows. On Friday, January 18, 2013, Plaintiff arrived home from work while it was still light outside "around 6:00 to 6:05" p.m. Dkt. No. 89-12, 125:7, 126:25. Plaintiff and his wife planned to drive to Orlando, Florida, that night to visit their son and his family. Id. at 149:5-15. At approximately 6:02 p.m., Plaintiff was turning into his driveway when he received a phone call from his wife. Id. at 132:5-17. Rather than continuing to his house after a day at work doing general repairs, Plaintiff instead drove to the mobile home. Id. at

4

126:17-128:8. He knew that he did not need to go home to pack because his wife always packed for him. Id. at 149:18-23, 150:15-20. Plaintiff would have noticed if smoke was emanating from his house—and at the time of his arrival at his land, his house was smoke-free. Id. at 126:15-23.

The mobile home, which Plaintiff intended to spruce up, had sat empty since his son and his family had moved out, approximately seventeen months earlier. Id. at 125:7-10. Plaintiff never made repairs to the mobile home prior to the evening of January 18, 2013, yet he chose that evening to drive to the mobile home to survey what work needed to be completed prior to anyone moving in. Id. at 128:4-11. Specifically, Plaintiff "moved a pile of trash that [his son] had left in the middle of the floor. [He] cut out some holes where the sheetrock was damaged, and [he] was [] cutting one of the holes when [he] got the call" that his house was on fire. Id. at 128:20-23. Plaintiff, who performs general repairs for a living, always works with his radio on. Id. at 146:23-25, 149:18-23. He did not hear anything unusual outside of the mobile home while he was working. Id. at 146:12-25.

b. **Mrs. Sheffield's Arrival at the House**

Mrs. Sheffield told Plaintiff that she was running late leaving the bank and that she was on her way home. Id. at 125:7-10, 132:16-22. During their brief conversation, Plaintiff

5

and his wife did not discuss their upcoming trip to Orlando. Id. at 151:18. After hanging up with her husband, Mrs. Sheffield called her cousin at 6:04 p.m. while she drove down Manila Avenue in Douglas, Georgia, which was along her normal route to her house. Id. at 140:18-141:15. That day, Mrs. Sheffield wore dark jeans and a patterned shirt, set off by a matching yellow jewelry set consisting of a necklace, earrings, and a ring. Dkt. No. 89-21, pp. 3-4. In her purse, she carried approximately $1,463.71 in cash. Dkt. No. 89-16, p. 5. Based on the location of Mrs. Sheffield's cell phone when she called her cousin, and assuming that she drove at normal speeds, it would have been impossible for her to arrive at her house before 6:19 or 6:20 p.m. Dkt. No. 89-12, 140:18-141:15.

c. **The Discovery of Fire at Plaintiff's House**

The Coffee County Fire Department was notified of the fire at Plaintiff's home at approximately 6:40 p.m. Dkt. No. 89-19, p. 3. A neighbor, Mark VonWaldner, saw the fire at Plaintiff's home and, while another witness, Janet Smith ("Smith"), called the police, he "beat on the horn just religiously, trying to wake up or see if somebody was in there." Dkt. No. 89-23, 13:14-17. Smith, who walked up to the burning house, noted that one could see through the house because there was neither fire nor "smoke [] downstairs." Dkt. No. 89-11, 26:4-15. Plaintiff testified that at approximately 6:45 p.m., he received a phone

6

call from his neighbor, Ezra Burke, notifying him that his house was on fire. Dkt. No. 89-12, 129:2-9, 132:25. Plaintiff did not ask Ezra Burke about his wife at that time. Id. at 129:21. Plaintiff alleges that he immediately "ran to the back door" of the mobile home where he could see his house "glowing through the woods." Id. at 129:11-12. Plaintiff then "jumped in [his] truck," drove down the dirt path, and pulled "into the edge of [his] yard," at approximately the same time as an arriving ambulance. Id. at 129:13-16. While Plaintiff was still in his car, his sister called him, and he spoke to her. Id. at 130:18-23. His sister testified that during this call, Plaintiff stated that Mrs. Sheffield could not be located at the scene. Dkt. No. 89-27, 21:22-24. Plaintiff's car contained a rifle and a pistol, which were visible to law enforcement officers. Dkt. No. 89-12, 157:1-6. Later that night, when law enforcement officials requested to search Plaintiff's truck, he initially refused to allow the search because the deputy did not have a warrant. Id. at 157:10-25.

Neighbors who had arrived at the scene told Plaintiff that they found Mrs. Sheffield's keys in the door leading from the carport to the interior of the house. Id. at 138:3-15. Upon learning that his wife's keys were in the door, Plaintiff alleges that he "knew then that she was somewhere around the door of the house." Id. at 138:25-139:7. Plaintiff alleges

7

that the fire marshal refused to allow him to go near the house. Id. at 139:7-12. Plaintiff never walked in or around the burning house searching for his wife. Id. Plaintiff proceeded to move Mrs. Sheffield's car farther away from the burning house. Id. at 138:22, 139:7-12. Plaintiff observed that the fire consumed the second floor of the house and that the flames "were going up the roof. The shingles on top of the house were already on fire." Id. at 172:1-2. Smith has a different recollection of Plaintiff's behavior at the scene. Dkt. 89-11. Smith recalls seeing Plaintiff drive up to his burning house and park, before getting out to light a cigarette. Id. at 41:1-25.

Within five minutes of arriving on the scene of the fire, Plaintiff retreated to a waiting ambulance. Id. at 129:7-8. Plaintiff remained in the ambulance for the rest of the evening, where he was treated by his physician, Dr. John David Arnett ("Dr. Arnett"), who had known him for more than a decade and for whom he also worked. Dkt. No. 95-11, 7:11-16. Dr. Arnett observed Plaintiff in the ambulance, noting that "[h]e was sitting there with a distant stare and was just rocking, squeezing his hands." Id. at 26:14-15. Given Plaintiff's high blood pressure, Dr. Arnett directed that medication be brought to treat Plaintiff. Id. at 30:1-15.

III. The Aftermath of the Fire

8

Efforts to locate Mrs. Sheffield remained unsuccessful until the next day, January 19, 2013, when her body was discovered in the charred debris of the carport. Dkt. No. 89-20, p. 7. The autopsy conducted by the Georgia Bureau of Investigation determined that Mrs. Sheffield died from "multiple shotgun wounds," including two wounds to her head and six buckshot wounds in and around her neck and shoulders. Dkt. No. 89-21, p. 7. Aside from the thermal injuries from the fire and the wounds from the shotgun, the autopsy did not reveal any other injuries to Mrs. Sheffield. Id. at pp. 2-10. The autopsy further revealed that Mrs. Sheffield's postmortem blood tested negative for a significant quantity of carboxyhemoglobin, which indicates that Mrs. Sheffield died before the fire started. Id. at pp. 3-5. The report concluded that her "manner of death [was] homicide." Id. at p. 7.

IV. **Defendants' Involvement in the Investigation of the Fire**

   a. **The Report of Defendants' Special Investigator**

Defendants assigned Hal Parrish ("Parrish")—a Special Investigative Unit Claim Representative—to conduct the investigation into the cause of the fire. Dkt. No. 89-2, ¶¶ 2, 6. Parrish retained fire investigator Luis Velazco ("Velazco") to further investigate the cause and origin of the fire. Id. ¶ 18. Velazco determined that the fire originated in the second floor bonus room and that the culprit used some kind of

9

ignitable material to accelerate the fire. Dkt. No. 82-8, p. 3. Plaintiff acknowledged that there was a half-full can of gas that Mrs. Sheffield had been using to maintain the hedges in their yard on the back porch of the house. Dkt. No. 89-12, 92:8-25. Based upon the spread of the fire, Velazco concluded in his written report that the fire "was the result of an **Incendiary or Intentionally set fire.**" Dkt. No. 82-8, p. 4 (emphasis in original). Velazco's conclusion caused Plaintiff to believe that someone intentionally ignited a fire at his home, especially after he learned that it was started by an accelerant. Dkt. No. 89-12, 153:11-15.

b. **Plaintiff's Affairs**

During the course of Defendants' investigation, Parrish discovered, and Plaintiff eventually admitted in his second examination under oath, that he had several liaisons during the course of his marriage. Dkt. No. 89-22, 4:1-15. Although Plaintiff initially maintained, under oath, that he has never been unfaithful to his wife, dkt. no. 99-1, 167:17-168:7, he then claimed that he had not been faithful to his wife since 2003. Dkt. No. 89-22, 4:17. Plaintiff later admitted to an affair seven years prior to his February 12, 2015 Deposition. Dkt. No. 95-7, 71:2. Plaintiff's sister, Dawn Wright, stated under oath that she had "heard" of rumors of Plaintiff's

10

infidelity prior to Mrs. Sheffield's murder. Dkt. No. 99-7, 29:21-30:15.

As Defendants discovered during the investigation, Plaintiff first became involved with Brandy Thomas in 2005. Dkt. No. 95-7, 65:7-70:3. After the fire, he signed a $30,000 loan for her to purchase a car in October, 2014. Dkt. No. 95-6, ¶ 5. Plaintiff then became involved with Kristy Smith in 2008. Dkt. No. 95-7, 70:4-71:2. After the fire, she lived with her brother at Plaintiff's mobile home on and off for approximately two months. Id.

While conducting its investigation, the Georgia Bureau of Investigation found a Verizon LG Ally cell phone in the center console of Plaintiff's truck. Dkt. Nos. 89-15, 38:15-18; 89-16, pp. 16-17. The Georgia Bureau of Investigation confirmed that Plaintiff owned the cell phone, and an examination thereof revealed that the phone contained nude pictures of Amy McKean ("McKean"). Dkt. Nos. 89-15, 43:7-46:25; 95-7, 65:1-6. Four days before Mrs. Sheffield's murder, on January 14, 2013, Plaintiff spoke to someone who answered McKean's cell phone for fourteen minutes at 8:11 p.m. Dkt. No. 89-16, p. 84. Two days before Mrs. Sheffield's murder, on January 16, 2013, Plaintiff spoke to someone who answered McKean's cell phone for eight minutes at 1:13 p.m. Id. In the month before his February 12, 2015 deposition, Plaintiff spoke to McKean approximately twice

per week, in addition to speaking to her the day before his February 12, 2015 deposition. Dkt. No. 89-16, p. 84. Plaintiff alleges that he last saw McKean in August, 2014. Dkt. No. 95-6, ¶ 7.

## DISCUSSION

At issue here is whether Defendants are entitled to partial summary judgment on Plaintiff's claim that Defendants, in bad faith, refused to pay Plaintiff's insurance claims. As will be set forth below, Defendants did not act in bad faith when they denied Plaintiff's Demand for Payment. It is clear that, as a matter of law, Defendants had ample grounds to dispute Plaintiff's demand.

Plaintiff argues that Defendants' investigation into his personal life and subsequent refusal to pay his claims constitutes bad faith and, as such, he demands damages. Dkt. No. 95, pp. 2-11. In response, Defendants argue that they did not act in bad faith because the circumstances surrounding Mrs. Sheffield's murder and the subsequent blaze justify their decision to withhold payment. Dkt. No. 89-1, pp. 19-26.[4] To

---

[4] Georgia law regarding the liability of an insurer for damages and attorney's fees for a bad faith refusal to pay claims states in relevant part:
> In the event of a loss which is covered by a policy of insurance and the refusal of the insurer to pay the same within 60 days after a demand has been made by the holder of the policy and a finding has been made that such refusal was in bad faith, the insurer shall be liable to pay such holder, in addition to the loss, not more than 50 percent of the liability of the insurer for the loss or $5,000.00, whichever

12

prevail on a claim for bad faith penalties under O.C.G.A. § 33-4-6, an insured must prove:

> (1) that the claim is covered under the policy, (2) that a demand for payment was made against the insurer within 60 days prior to filing suit, and (3) that the insurer's failure to pay was motivated by bad faith. Penalties for bad faith are not authorized, however, where the insurance company has any reasonable ground to contest the claim and where there is a disputed question of fact. Bad faith is shown by evidence that under the terms of the policy under which the demand is made and under the facts surrounding the response to that demand, the insurer has no good cause for resisting and delaying payment.

Lawyers Title Ins. Corp. v. Griffin, 691 S.E.2d 633, 636-37 (Ga. Ct. App. 2010) (citations, punctuation, and emphasis omitted). The insured bears the burden of proving that the insurer acted in bath faith. Allstate Ins. Co. v. Smith, 597 S.E.2d 500, 502 (Ga. Ct. App. 2004). The insurer thus need only present "[a] defense going far enough to show reasonable and probable cause for making it, [which] would vindicate the good faith of the company as effectually as would a complete defense to the action." Id.

In the instant matter, there are several reasonable grounds to question the fire at Plaintiff's home. An insurance company "can prevail in an arson defense based solely on circumstantial

---

is greater, and all reasonable attorney's fees for the prosecution of the action against the insurer. O.C.G.A. § 33-4-6(a).

evidence if it shows that the fire was of incendiary origin and that the plaintiff had both the opportunity and motive to have the fire set." Forston v. Cotton States Mut. Ins. Co., 308 S.E.2d 382, 385 (Ga. Ct. App. 1983).

Here, the Court is presented with a situation where there was an incendiary fire. The Defendants have presented ample evidence that Plaintiff had both the opportunity and the motive to light the blaze. As to the incendiary origin, Velazco determined that the culprit used an accelerant to fan the flames of the "intentionally" set fire. Dkt. No. 82-8, p. 4. The Court also notes that a half-full gas can was found on the back porch of the home and that Plaintiff concedes that the fire was intentionally set by someone. Dkt. No. 89-12, 92:8-25, 153:15.

Second, Plaintiff clearly had the opportunity to set the fire. Plaintiff arrived at his property at some time prior to his wife. Dkt. No. 89-12, 125:7, 126:25. Regardless of whether his arrival happened at 6:02 p.m. or earlier, the fact remains that he had the *opportunity* to set the fire, given that he had ample time—at least twenty minutes, if not more—to prepare.

As for motive, the Defendants have developed ample evidence that the fire was set to conceal the murder of Mrs. Sheffield, who the evidence shows died of gunshot wounds to the head. Moreover, the Defendants developed facts which provided them with good cause to believe Plaintiff may be responsible for her

14

death. Defendants, on the basis of these circumstances, may ascribe a motive to Plaintiff. Indeed, the National Fire Protection Association ("NFPA") has recognized "crime concealment" as a motive for setting a fire. Dkt. No. 89-25, pp. 2-3. These circumstances demonstrate that Defendants did not act in bad faith in denying Plaintiff's claim. Counsel for Plaintiff's arguments on this point are thus unavailing.

What follows is a compilation of eleven pieces of evidence which support Defendants' decision to deny payment of Plaintiff's insurance claims, although more have been presented by Defendants. First, on a Friday evening when he and his wife were supposed to embark upon a lengthy drive to Orlando, Plaintiff chose to work on a mobile home that had sat empty for more than one year, even though he did not know when—or if—Hersey would move into it. Dkt. No. 89-12, 125:11-126:11. Second, the murder and subsequent fire coincided with a time when Plaintiff's entire family—who all lived on Plaintiff's land—were on vacation in Hawaii. Id. at 110:22-111:18. Third, while Plaintiff listened to music, cleared trash, and assessed problems in the sheetrock of the mobile home, he claims that he was unable to hear anything outside. Id. at 146:23-25, 149:18-23. Specifically, Plaintiff was unable to hear a car horn that a neighbor "religiously" blew for at least one minute in an effort to warn anyone in the burning house that it was on fire—a

house that was approximately 596 feet away from where Plaintiff worked. Dkt. No. 89-13.

Fourth, there is testimony indicating that after being notified of the fire at his home and while driving to the fire, Plaintiff spoke to his sister and told her that Mrs. Sheffield was missing—before anyone had had the opportunity to inform him that she could not be located. Dkt. No. 89-12, 130:18-23; Dkt. No. 89-27, 21:22-24. Fifth, Plaintiff has given competing versions of when he arrived at his property. First, Plaintiff argues that he arrived sometime between 6:00 p.m. and 6:05 p.m. Dkt. Nos. 89-12, 125:7. Plaintiff now argues that he arrived at his property, which was not on fire, earlier than 6:02 p.m., dkt. no. 95-6, ¶¶ 11-12—meaning that he had even more time to potentially prepare. Sixth, there is evidence that whoever did this did not do it to rob Mrs. Sheffield, given that she was shot and her body was burned with gold jewelry and approximately $1,500 cash still in her possession. Dkt. No. 89-21, pp. 3-4; Dkt. No. 89-16, p. 5.

Seventh, although Plaintiff initially denied, under oath, having any affairs, he eventually admitted to several indiscretions during the course of his marriage, which included liaisons with at least three different women and receipt of nude photos from McKean. Dkt. No. 89-22, 4:1-15. Eighth, he logged two lengthy telephone conversations with someone who answered

McKean's cell phone in the days before Mrs. Sheffield's murder. Dkt. No. 89-16, p. 84. Ninth, Plaintiff maintained relationships with his paramours after Mrs. Sheffield's murder, by: (1) co-signing a $30,000 loan for Brandy Thomas, dkt. no. 95-7, 65:7-70:3; (2) allowing Kristy Smith to reside in his mobile home on and off for two months, id. at 70:4-71:2; and (3) continuously speaking to McKean, including the day before his February 12, 2015 deposition. Dkt. No. 89-16, p. 84. Tenth, as his wife remained missing and his house burned, Plaintiff refused to cooperate with law enforcement's request to search his truck and demanded that they get a warrant. Dkt. No. 89-12, 157:10-25. Eleventh, Smith disputes Plaintiff's report of his initial behavior during the house fire. Dkt. No. 89-11, 42:1-25. Smith observed Plaintiff drive up to his burning house, get out of the truck, light up a cigarette, and proceed to smoke. Id. These pieces of evidence provide ample cause for Defendants to withhold payment.

It should be noted that Plaintiff disputes some of this evidence. For example, he disagrees with some of the other witnesses. Moreover, he believes that he will be able to develop evidence that this was perhaps a part of a gang initiation. But that is not the point—the fact that he can dispute some of Defendants' evidence does not mean Defendants acted in bad faith. To be clear, this Order does not find that

Plaintiff killed his wife or set the fire. It simply finds that Defendants did not act in bad faith in positing that he did. A jury will decide coverage questions. Given the evidence developed, the Defendants' choice to have a jury decide is not bad faith. To succeed on their Partial Motion for Summary Judgment, Defendants do not need to prove that Plaintiff murdered his wife and set his house on fire—they merely need to prove that there are reasonable grounds to contest Plaintiff's claim. See S. Fire & Cas. Ins. Co. v. Nw. Ga. Bank, 434 S.E.2d 729, 731 (Ga. Ct. App. 1993) (explaining that the fact that the plaintiff "may not have actually set the fire or that the investigation was not flawless is of no consequence" to the court's decision to not find bad faith on the part of the insurance company).

A reasonable person, assessing the weight of the evidence, would, at least, harbor some suspicion regarding Plaintiff and his role in the events that unfolded on January 18, 2013.[5] Given the circumstances of the case at hand, Defendants have not acted in bad faith as they have reasonable grounds to contest Plaintiff's claim. Accordingly, Defendants' Partial Motion for Summary Judgment is hereby **GRANTED**.

**CONCLUSION**

---

[5] The Court also notes that the criminal investigation into Mrs. Sheffield's murder is ongoing.

For the reasons set forth supra, Defendants' Partial Motion for Summary Judgment (Dkt. No. 89-1) is **GRANTED**. Defendants did not act in bad faith in denying Plaintiff's demand for payment. Accordingly, Defendants' Partial Motion for Summary Judgment is **GRANTED** as to the fraud claims **(Counts II, III, VII, and VIII)**, the conspiracy claims **(Counts IV and IX)**, and the bad faith claims **(Counts V and X)**.

**SO ORDERED**, this 24th day of February, 2016.

_____
LISA GODBEY WOOD, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA